[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 13-11859

D.C. Docket No. 2:11-cv-00089-JES-DNF

UNITED STATES OF AMERICA,

Plaintiff,

J. MICHAEL MASTEJ,
ex. rel.,

Plaintiff-Appellant,

versus

HEALTH MANAGEMENT ASSOCIATES, INC.,
NAPLES HMA, LLC,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Florida

(October 30, 2014)

Before HULL, COX and FARRIS,[*] Circuit Judges.

HULL, Circuit Judge:

Plaintiff-relator Michael Mastej brought a <u>qui tam</u> action against two

Defendants, Health Management Associates, Inc. and Naples HMA, LLC, alleging

violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 <u>et seq.</u>  The district

court dismissed Mastej's complaint for failure to satisfy the heightened pleading

requirements in Rule 9(b) of the Federal Rules of Civil Procedure, which require a

plaintiff to state with particularity the circumstances constituting fraud.  <u>See</u> Fed.

R. Civ. P. 9(b).

Plaintiff Mastej appeals.  After review of the record and the parties' briefs,

and having the benefit of oral argument, we affirm in part and reverse in part.

## I.  PARTIES

### A.    Defendant HMA and Defendant Naples HMA

Defendant Health Management Associates, Inc. ("HMA") is a business

organization operating approximately 56 hospitals in 15 states.  Defendant Naples

HMA, LLC ("Naples HMA") is a subsidiary of HMA.  Defendant Naples HMA

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

does business under the name Physicians Regional Medical Center ("the Medical Center").

The Medical Center has two hospital campuses:  the Collier Boulevard facility and the Pine Ridge facility.  The Medical Center employs separate Chief Executive Officers ("CEOs") at each campus.  Although the Medical Center has two campuses, it is a single hospital that collectively operates under one hospital license and provider number.

**B.    Plaintiff Mastej**

Mastej has over 30 years of experience in the health care industry.  Before he began working for Defendant HMA in 2001, Mastej held many positions in the health care industry.  He worked as a Medicare/Medicaid auditor for Michigan Blue Cross, a reimbursement specialist with Humana, and as the CEO of several hospitals and medical centers.

From 2001 to February 2007, he was Defendant HMA's Vice President of Acquisitions and Development.  In this role, Mastej attended monthly operations meetings with Defendant HMA's CEO, Chief Operating Officer ("COO"), regional senior vice presidents, divisional vice presidents, and corporate department heads. While Vice President at HMA, Mastej "often attended weekly case management meetings in which Medicare and Medicaid patients and billing were discussed."

3

Mastej alleges that in these HMA weekly case management meetings, "every patient was reviewed, including how the services were being billed to each patient," and as a result Mastej was "intimately familiar with the payor mix at the hospitals."[1]  As HMA's Vice President, Mastej was "specifically aware that the doctors and medical groups at issue in this case <u>referred</u> Medicare and Medicaid patients for service at Collier Boulevard and Pine Ridge" and "treated Medicare and Medicaid patients at those hospitals."  Additionally, Mastej flew on HMA's corporate jets, making him familiar with the procedures for HMA's use of its corporate jets.

In February 2007, however, Mastej left Defendant HMA to work for its subsidiary, Defendant Naples HMA.  From February 5, 2007 to October 2007, Mastej was the CEO of the Medical Center's Collier Boulevard facility.  Mastej's responsibilities as Collier Boulevard's CEO included "speaking to Defendants' upper management on all aspects of management of Collier Boulevard."

---

[1]The parties' briefs dispute whether paragraph 61 of the complaint alleges that Mastej attended these weekly case management meetings as Defendant HMA's Vice President or as CEO of Collier Boulevard.  The actual pleadings control this issue because the "weekly meetings" averment in paragraph 61 refers to only Mastej's tenure as an HMA Vice President.

We recognize that subsequent to the district court's dismissal, Mastej filed a Rule 60(b) motion and an affidavit, where he attempted to clarify that he also attended these case management meetings while he was CEO of Collier Boulevard through October 2007.  Because this was after the district court had dismissed his complaint, his actual complaint still controls.

4

Additionally, Mastej negotiated many physician contracts for "on-call" coverage at Collier Boulevard.

Through these two positions, Mastej "was familiar with the operational aspects pertinent to the fraudulent schemes in question."  And through these positions, "Mastej was familiar with the services offered by Collier Boulevard and Pine Ridge, the patient demand for [those] services, the staffing necessary to meet patient demand for [those] services, the revenues generated by [those] services, and the costs of providing [those] services."

## II.  FALSE CLAIMS ACT

On January 11, 2010, Mastej, as a relator, filed his initial qui tam complaint alleging that the Defendants violated the False Claims Act ("FCA").[2]  For the purposes of this appeal, the operative complaint is Mastej's third amended complaint (the "complaint"), filed on March 8, 2012.

The FCA imposes liability for any person who, inter alia: (1) knowingly presents false claims to the government (the "presentment" provision); (2) knowingly makes or uses a false statement "to get" the government to pay a claim (the "make-or-use" provision); or (3) knowingly makes a false record or statement

---

[2]The parties treat Defendants HMA and Naples HMA collectively as "the Defendants." For purposes of this appeal, we treat them as Defendants collectively unless otherwise specified.

to decrease an obligation to pay the government (the "reverse-false-claim"

provision).  See 31 U.S.C. § 3729(a)(1), (2), (7) (1994).[3]  The FCA permits a

private individual, known as a relator, to bring a qui tam action on the relator's

behalf and the government's behalf for any FCA violation.  See 31 U.S.C.

§ 3730(b).[4]

The underlying bases for Mastej's FCA claims are his allegations that:

(1) the Defendants made payments to six neurosurgeons and provided a golf-trip

benefit to four other doctors to induce them to refer, or to reward them for

referring, Medicare patients to the Defendants' Medical Center in Naples, Florida;

(2) those ten physicians referred Medicare[5] patients to the Medical Center for

---

[3]Congress amended the FCA in 2009.  See Fraud Enforcement and Recovery Act, Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621–25 (2009) ("FERA").  Although Mastej now contends that his case is governed by the 2009 version of the FCA, that is not what Mastej pled in his complaint.  Instead, Mastej's complaint cited and quoted the old version of the statute for his contentions in Count II.  In any event, while there are material differences between the old and new versions, we conclude that none of these differences affects the outcome of this particular case, as explained later.

[4]A complaint is first filed under seal to allow the government time to investigate and possibly intervene.  31 U.S.C. § 3730(b)(2).  If the government declines to intervene, the relator may continue with the action, id. § 3730(c)(3), and if successful, may recover between 25 and 30 percent of the judgment or settlement, plus reasonable expenses, attorney fees, and costs, id. § 3730(d)(2).  An FCA violator is also subject to statutory penalties of between $5,000 and $10,000 per claim and treble damages.  31 U.S.C. § 3729(a).  The United States declined to intervene in this qui tam action.

[5]Mastej's complaint makes identical allegations with respect to Medicaid.  For purposes of this appeal, the distinction between Medicare and Medicaid is not relevant.  Unless a distinction between the programs is helpful, this opinion uses "Medicare" as a short-hand for both "Medicare and Medicaid."

6

medical services, which were provided; (3) the Defendants' Medical Center submitted "interim claim forms" and annual "hospital cost reports" requesting payment for the referred patients' medical treatment, which Medicare paid; (4) the Defendants violated the Stark and Anti-kickback statutes by seeking any Medicare reimbursement at all for the treatment of patients referred by doctors to whom the Defendants had given benefits; and (5) the Defendants then falsely certified to the government in the hospital cost reports that the services were provided in compliance with applicable laws, including the Stark and Anti-kickback statutes.[6]

Importantly, Mastej does not assert that the Defendants provided the referred patients with medical services that were not needed, not rendered, of inferior quality, or overpriced. Rather, even though the medical services were needed, provided, and properly priced, Mastej contends that the Defendants made false claims or false statements within the meaning of the FCA (1) by seeking any Medicare reimbursement whatsoever for patients referred by the ten named doctors due to the Defendants' pay-for-referral scheme and (2) by then certifying to the

---

[6]Because the Defendants moved to dismiss Mastej's complaint, we present the complaint's allegations as true and construe them in the light most favorable to Mastej. See Chaparro v. Carnival Corp., 693 F.3d 1333, 1335 (11th Cir. 2012). We note that, ultimately, the evidence may not support Mastej's allegations, and, thus, the allegations we recite as "facts" may turn out not to reflect the true facts of the case.

7

government that they provided these medical services in compliance with applicable laws, such as the Stark and Anti-kickback statutes.

With this overview of Mastej's FCA claims, we review: (1) the parts of the Stark and Anti-kickback statutes relevant to this case; (2) the complaint's allegations about the "on-call" payments to six neurosurgeons and the golf-trip benefit for four other doctors, both of which allegedly constituted "financial relationships" within the meaning of the Stark statute and "remuneration" within the meaning of the Anti-kickback statute; and (3) the Defendants' interim claim forms and annual hospital cost reports.

### III.  STARK AND ANTI-KICKBACK STATUTES

#### A.    Stark Statute

In its most general terms, the Stark statute prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of "financial relationships" with that hospital.  See 42 U.S.C. § 1395nn(a)(1)(A). And, in turn, the Stark statute prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such referred patients.  See id. § 1395nn(a)(1)(B).

Although the Stark statute broadly defines "financial relationships," the statute contains numerous exceptions to that definition.  See id. § 1395nn(a)(2); id.

8

§ 1395nn(b)–(e) (listing exceptions to the broad definition of "financial relationship" such as "bona fide employment relationships").

For the limited purposes of their motion to dismiss, the Defendants do not argue that an exception to the Stark statute's broad definition of "financial relationship" applies to the financial-referral incentives alleged in Mastej's complaint. Rather, the Defendants concede that the complaint's factual allegations about the neurosurgeon payments and golf benefit—taken as true at this motion-to-dismiss stage—satisfy the Stark statute's definition of "financial relationship" between a doctor and a hospital.

Where such a Stark-defined "financial relationship" exists—as the Defendants concede for the purposes of their motion to dismiss—a doctor "may not make a referral to the [hospital]," and the hospital "may not present or cause to be present[ed] a [Medicare] claim." See id. § 1395nn(a)(1). For purposes of this motion, the Defendants also do not contest that they could not seek Medicare reimbursement for medical services (even though actually rendered to patients) if those patients were referred by doctors in exchange for the particular financial incentives alleged in the complaint.

9

**B.     Anti-kickback Statute**

Generally speaking, the Anti-kickback statute prohibits a hospital from financially inducing a person to refer a Medicare patient.  See 42 U.S.C. § 1320a-7b(b).  Relevant to this case, the Anti-kickback statute forbids knowingly "offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual [for medical services] for which payment may be made in whole or in part under a Federal health care program" such as Medicare.  Id. § 1320a-7b(b)(2)(A) (emphasis added); see also id. § 1320a-7b(b)(3) (providing exceptions to this general rule).

A violation of the Anti-kickback statute occurs when the defendant (1) knowingly and wilfully, (2) pays money, directly or indirectly, to doctors, (3) to induce the doctors to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare.  See United States v. Vernon, 723 F.3d 1234, 1252 (11th Cir. 2013) (setting forth the elements of an Anti-kickback statute violation under § 1320a-7b(b)(2)(A)).

Again, Mastej acknowledges that the Defendants provided necessary medical services to the referred patients, but he claims that the Defendants were prohibited from seeking any Medicare reimbursement at all because the

Defendants gave payments or a golf-trip benefit to induce the referrals in violation of the Anti-kickback statute.  We next outline the complaint's allegations about those financial incentives.

## IV.  TWO FINANCIAL-INCENTIVE SCHEMES FOR REFERRALS

### A.    "On-call" Neurosurgeon Scheme in 2007-2009

Doctors at the Medical Center's Collier Boulevard and Pine Ridge facilities performed, among other things, neurosurgery services that were scheduled well before being performed.  As alleged, Collier Boulevard and Pine Ridge did not offer emergency or un-planned neurosurgery services.[7]  To the extent that an existing or prospective patient required emergency neurosurgery, the Medical Center would refer that patient to another hospital.  Thus, Collier Boulevard and Pine Ridge allegedly had no need for neurosurgeons to serve in "on-call" capacities.  Both locations maintained sufficient other "on-call" coverage without the need for neurosurgeons to be "on call" for planned surgeries.

Nevertheless, according to Mastej's complaint, the Medical Center's Pine Ridge location maintained a pay-for-referral scheme to pay certain neurosurgeons

---

[7]The complaint states that Pine Ridge did not offer emergency neurosurgery from at least 2007 to 2009.

11

ostensibly to be "on call" to perform emergency or un-planned neurosurgery services, even though doctors at that location did not perform such services.

The CEO of the Medical Center's Pine Ridge facility (Geoff Moebius) negotiated "on-call" coverage contracts with several neurosurgeons. In January 2007, Drs. Michael Lusk, John Drygas, Mark Gerber, Gary Colon, and Paul Dernbach entered into "on-call" neurosurgery contracts. In 2009, Dr. Rick Bhasin entered into a similar "on-call" contract. Pursuant to the "on-call" contracts, the Medical Center paid these six neurosurgeons $1,000 per weekday of "on-call" coverage and $2,000 per weekend day of "on-call" coverage. These payments for "on-call" coverage to the six neurosurgeons "were significantly above the fair market value for the services these neurosurgeons provided."[8]

During the time that Mastej was CEO of the Medical Center's Collier Boulevard facility (February through October of 2007), Geoff Moebius (CEO of Pine Ridge) asked Mastej to split the cost of the neurosurgeon "on-call" contracts between Pine Ridge and Collier Boulevard. CEO Moebius told Mastej that the "on-call" contracts "were important to keep the neurosurgeons referring lucrative scheduled surgeries at Pine Ridge, including surgeries involving Medicare and

---

[8]As of March 2012, Drs. Lusk, Gerber, Colon, and Bhasin allegedly continued to provide "on-call" coverage for Pine Ridge.

12

Medicaid patients." CEO Moebius said that "these neurosurgeons would begin referring scheduled surgeries to Collier Boulevard if [that location] shared in the cost of the call coverage." Mastej refused to split the cost of the "on-call" neurosurgery contracts.

The complaint alleges that these "on-call" neurosurgery contracts constituted prohibited "financial relationships" (within the meaning of the Stark statute) and illegal "remuneration" (within the meaning of the Anti-kickback statute) because Pine Ridge did not perform emergency neurosurgery services, did not need "on-call" neurosurgeons, and made the payments only as inducements or rewards for patient referrals. Second, the Medical Center paid the neurosurgeons significantly inflated amounts in relation to the "on-call" services provided.

## B.    Defendants' Golf-Trip Benefit in 2008

Mastej's complaint also alleges that the Defendants flew several Naples, Florida doctors—at the Defendants' expense and on Defendant HMA's corporate jet—to an April 2008 golf tournament. The Defendants provided the doctors with free rental cars, tournament tickets, meals, and drinks. The Defendants "selected the physicians [for this 2008 trip] based on their ability and willingness to send patient referrals to HMA hospitals, particularly Collier Boulevard." As alleged, the golf-trip benefit constituted a "financial relationship" (within the meaning of

13

the Stark statute) and illegal "remuneration" (within the meaning of the Anti-kickback statute).[9]

The Defendants provided the 2008 golf trip to "generat[e] patient referrals, including Medicare and Medicaid patients."  CEO Moebius described the golf trip as a "once in a lifetime business development tool" for the Medical Center.  Each flight had a single doctor and at least one hospital administrator, who discussed how the doctor could do additional business with HMA hospitals, in particular the Collier Boulevard location.  Four doctors received the 2008 golf-trip benefit: (1) Dr. William Figlesthaler; (2) Dr. Aldo Beretta; (3) Dr. Morton Bertram; and (4) Dr. Rob Hanson.[10]  However, Mastej does not allege these four doctors were involved in the "on-call" scheme or that he had any discussions with these doctors or any persons on the golf trip.  Mastej does not allege the source for what was discussed on the trip or the source of the alleged Moebius quote.

As alleged, the Defendants maintained a "Stark Log" to track any non-monetary compensation paid to doctors who referred Medicare patients to the

---

[9]Mastej contends that the "non-monetary compensation" exception in the Stark statute did not apply to the golf tournament trips because the value of each trip exceeded the statutorily permissible amount (i.e., $338) by more than fifty percent (i.e., the value of each trip was at least $507).

[10]As alleged, the Defendants provided this golf trip one time during April 2008.  Mastej does not allege that the Defendants provided similar trips to other golf events or at other times.

Medical Center.  The Defendants' practice was to add a doctor to the Stark Log only after the doctor made a patient referral.  The Defendants entered the name of each doctor who received the golf trip in the Medical Center's Stark Log and recorded a below-market value on the golf-trip benefit.

As to both the golf-trip benefit and on-call payments, Mastej's complaint does not allege that the Defendants' claims for reimbursement included the costs of their "pay-for-referral schemes"; rather, the Defendants' claims covered only the costs of the actual medical treatment rendered to the referred patients.  Mastej also does not allege that the six neurosurgeons or four golf-trip doctors treated the referred patients.  What Mastej alleges is that the Defendants could submit no reimbursement claim at all for actual services rendered to any patients referred by the ten doctors, no matter who treated the patients, because those ten physicians received the alleged financial incentives for such referrals.

As noted earlier, the Defendants—for purposes of the motion to dismiss—do not contest that the financial incentives were paid to the ten doctors as alleged. What the Defendants do contest, as explained later, is whether the complaint sufficiently alleges that the ten doctors actually referred patients, or that the Defendants submitted any false claim for any such referred patient, or that the government paid any such claim for any such referred patient.  With this

15

background about the financial incentives, we turn to the complaint's allegations about the Medicare reimbursement process.

## V.  CLAIMS FOR MEDICARE REIMBURSEMENT

Mastej's allegations about the financial incentives are detailed and fairly specific as to the amount and frequency of the incentive, the named doctor, and the time period.  In contrast, his allegations about the referred patients and Medicare claims for referred patients are generalized and mostly conclusory.

### A.    Interim Claim Forms

To obtain Medicare reimbursements for any patient (whether referred or not), the Defendants' hospitals submit "interim claim forms" to the government as medical services are rendered.  The government reimburses the hospitals based on the information provided in the forms.

Mastej's complaint does not identify any specific Medicare claim by date, type of service, or amount for any patient, much less or for any <u>referred patient</u> by one of the ten doctors.  Nor does it identify how many patients were so referred during any week or month or year—or how many patients any of the ten named doctors referred.  Mastej's complaint also gives no specifics as to what was billed or collected for the prohibited referrals.  In short, there are no allegations about which patients, which interim claims, or which payments.  There is only the

16

general allegation that the ten doctors referred patients and Defendants submitted Medicare claims for patients referred by the ten doctors and were paid.

**B.    Annual Hospital Cost Reports**

Mastej's complaint also refers to the annual hospital cost reports, but there is also no reference to referred patients in those cost reports.  Here is what the complaint says about those cost reports.

Because the Defendants' Medical Center has one hospital license and one provider number, the Defendants submitted one combined annual hospital cost report covering both Collier Boulevard and Pine Ridge.  As alleged, the hospital cost report is the final Medicare claim that a hospital submits annually to the government.

The annual hospital cost report states the total amount of reimbursement the Defendants' Medical Center believes it is due for the year.[11]  From this sum, the report subtracts the total payments made during the year to determine the amount owed back to the Medicare Program or the amount owed to the Defendants' Medical Center.  The hospital cost report merely totals the amounts billed and paid for all Medicare patients in a calendar year, without giving any specifics.

17

Medicare relies on annual hospital cost reports to determine whether a hospital is entitled to a greater reimbursement than the hospital already received based on interim claim forms, or whether the hospital should reimburse Medicare because the hospital was over-paid during the calendar year.

The Defendant HMA's individual hospital campuses, such as Collier Boulevard, do not prepare the annual cost report. Rather, Defendant HMA's reimbursement department prepared the hospital cost reports for each of HMA's hospitals. Once prepared, Defendant HMA gave those cost reports to Defendant Naples HMA's Medical Center for the ultimate execution by the hospital's chief administrator or his responsible designee.

As alleged, the Defendants submitted these annual hospital cost reports for the Medical Center to Medicare: (1) a 2007 hospital cost report submitted May 30, 2008, and signed by Pine Ridge CEO Geoff Moebius; (2) a 2008 hospital cost report submitted June 7, 2010, and signed by Medical Center CFO Todd Lupton; and (3) a 2009 hospital cost report submitted May 26, 2010, and signed by CFO

_____

[11]It totals "Medicare liability for inpatient services . . . with any other Medicare liabilities" to "determine[] Medicare's true liability for services rendered to Medicare beneficiaries during the . . . fiscal year."

18

Lupton.[12]  Each report contained a certification that the Medicare "services identified in th[e] report were provided in compliance with [health care] laws and regulations."

Notably, since Mastej left the Defendants' employ in October 2007, there is no allegation that Mastej signed or helped prepare any of the hospital cost reports. Even the 2007 hospital cost report was not submitted to Medicare until May 30, 2008.

## VI.  THREE COUNTS IN THE COMPLAINT

Based on these allegations, Mastej's complaint brought three causes of action.  Count I is the presentment count and alleges that the Defendants violated the FCA by knowingly presenting (i.e., submitting) false interim claim forms and false annual hospital cost reports to Medicare.  See 31 U.S.C. § 3729(a)(1) (1994). Mastej contends that the interim claim forms and hospital cost reports were false because (1) they sought reimbursement for medical services that were not legally reimbursable at all by Medicare due to the Defendants' Stark and Anti-kickback

---

[12]The complaint alleges that the Defendants submitted the 2008 report on June 7, 2010 after they submitted the 2009 report on May 26, 2010.  Whether this is the case or simply a scrivener's error is unimportant to the issues presented on appeal.

19

violations and (2) the annual hospital cost reports then certified the Defendants' compliance with federal laws and regulations.

Count II is the make-or-use count. It alleges that the Defendants "knowingly made, used, or caused to be made or used, false records or statements—i.e., the false express or implied certifications of compliance and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendant[s] in submitting the cost reports and Requests for Reimbursement—to get false or fraudulent claims paid or approved by the Government." See 31 U.S.C. § 3729(a)(2) (1994).[13]

Count III is the reverse-false-claim count. It alleges that the Defendants violated the FCA by knowingly making false statements on their interim claim forms and hospital cost reports in an effort to avoid repaying money owed to Medicare. See 31 U.S.C. § 3729(a)(7) (1994). Mastej contends that the

---

[13]In 2009, Congress amended the FCA. See footnote 3, supra. Under the pre-amendment version, a "make or use" violation occurred when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (1994) (emphasis added). After the 2009 amendment, a "make-or-use" violation occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009) (emphasis added). Mastej's Count II allegations track the pre-amendment version.

20

Defendants violated this provision because they knowingly prepared their false claims and reports to conceal or avoid their responsibility to repay Medicare for its payout of claims that were not legally reimbursable.[14]

## VII.  DEFENDANTS' MOTION TO DISMISS

On March 26, 2012, the Defendants moved to dismiss Mastej's complaint.[15] The Defendants asserted that Mastej's complaint lacked the particularity required by Rule 9(b).

For the purposes of their motion to dismiss, the Defendants did not dispute that—as alleged—(1) the "on-call" neurosurgery contracts in 2007-2009 and the 2008 golf-trip benefit provided to the doctors created financial-referral incentives in violation of the Stark and/or Anti-kickback statutes[16] and (2) thus, the Defendants could not seek any Medicare reimbursement for medical services rendered to any patients referred by the ten doctors who received those financial incentives.

---

[14]Mastej's complaint also alleges a Count 4, which was similarly dismissed by the district court for failure to state a claim.  Mastej does not appeal the dismissal of Count 4, and we do not discuss it further.

[15]The Defendants elected not to answer Mastej's complaint.

[16]We express no opinion on whether the conduct alleged in Mastej's complaint actually violates the Stark or Anti-kickback statutes.

21

The Defendants did dispute, however, whether Mastej's complaint sufficiently and particularly alleged that the Defendants submitted or presented any false claim to the government for these referred patients or that the government paid any such claim. For example, the Defendants argued that Mastej's complaint failed to identify a single patient referred by the six neurosurgeons or four other doctors, a single interim claim form for a referred patient, the dates and amounts of any claims submitted for referred patients, or a single certification involving referred patients rendered false by the Defendants' financial-incentive schemes.

The district court granted the Defendants' motion to dismiss, and Mastej now appeals.[17]

## VIII.  LEGAL PRINCIPLES

Rule 9(b) applies in FCA cases. United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1308-09 (11th Cir. 2002). An FCA complaint must therefore "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and

22

fraudulent behavior." United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 (11th Cir. 2006) (quotation marks omitted). An FCA complaint "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009) (quotation marks omitted).

Because the submission of an actual claim to the government for payment is "the sine qua non" of an FCA violation, Clausen, 290 F.3d at 1311, a plaintiff-relator must "plead the submission of a false claim with particularity," United States ex rel. Matheny v. Medco Health Solutions Inc., 671 F.3d 1217, 1225 (11th Cir. 2012). To do so, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." Id.

Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were

_____

[17]We review de novo a district court's grant of a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure. Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1288 (11th Cir. 2010).

likely submitted or should have been submitted to the Government." Clausen, 290 F.3d at 1311 (emphasis added). Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." Id.

This Court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." Atkins, 470 F.3d at 1358. Providing exact billing data—name, date, amount, and services rendered—or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted. See, e.g., Hopper, 588 F.3d at 1326; Atkins, 470 F.3d at 1358. However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim. See Clausen, 290 F.3d at 1312 & n.21 (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"); see also Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1512 (11th Cir. 1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.").

24

Under this Court's nuanced, case-by-case approach, other means are available to present the required indicia of reliability that a false claim was actually submitted. Although there are no bright-line rules, our case law has indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims. See Walker, 433 F.3d at 1360 (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices with the defendant's office manager formed the basis for the relator's belief that claims were actually submitted to the government).

By contrast, a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation. See Atkins, 470 F.3d at 1359 (holding that Rule 9(b) was not satisfied where the relator was a doctor who did not allege first-hand knowledge of the hospital's submission of false claims). Additionally, a corporate outsider likely does not have the required access to learn enough about the defendants' billing practices. See Clausen, 290 F.3d at 1314 (noting that a corporate outsider's lack of information about the defendants' billing practices makes it more difficult to gather the factual specifics necessary to meet Rule 9(b)'s requirements).

25

At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted.   See Corsello v. Lincare, Inc., 428 F.3d 1008, 1013-14 (11th Cir. 2005) (finding insufficient indicia of reliability after noting that the relator "did not explain why he believes fraudulent claims were ultimately submitted").  It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, see id. at 1014, to base his knowledge on rumors, see Atkins, 470 F.3d at 1359, or to offer only conjecture about the source of his knowledge, see United States ex. rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1303 n.4 (11th Cir. 2010).

With this background, we examine whether Mastej's complaint sufficiently states an FCA claim with the requisite particularity under Rule 9(b).

### IX.  SUFFICIENCY OF MASTEJ'S COMPLAINT

#### A.    Nature of Mastej's FCA Case

The key allegations in Mastej's complaint are that (1) the Defendants made payments to ten identified doctors to induce them to refer, or reward them for referring, patients for treatment at the Defendants' Medical Center; (2) the ten doctors referred patients, and the Defendants treated them; (3) the Defendants submitted interim claim forms and annual hospital cost reports to Medicare requesting payment for those referred patients' treatment; (4) Medicare paid for

treatment of patients referred by the ten doctors; and (5) the Defendants falsely certified in the annual hospital cost reports that the Defendants had complied with all applicable laws.[18]

As to Counts I and II, Mastej's FCA theory is that the Defendants' Medicare interim claims and hospital cost reports, taken together, were false because (1) the Defendants were not legally permitted to seek any Medicare reimbursement at all for any of those referred patients due to the Stark and Anti-kickback violations; (2) the annual hospital cost reports totaled the amounts due for all interim claims made by the hospital for that year, and thus total amounts shown in each cost report necessarily included the amounts received for the referred patients; and (3) the hospital cost reports falsely certified that the medical services for the year were provided in compliance with the applicable health care laws. See Walker, 433 F.3d at 1356; McNutt ex rel. United States v. Haleyville Medical Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005).[19]

## B.    Particularized Allegations of Financial Incentives for Doctors

---

[18]At this juncture, Mastej does not dispute that the Defendants' interim claim forms accurately described medical services needed, rendered, and properly priced.

[19]Given that this case involves an express certification of compliance in the hospital cost reports, we need not and do not express any opinion on the required elements of any "implied certification" theory in FCA cases.

Mastej's complaint identifies the financial incentive schemes in great detail. He gives the names of the doctors who received the incentives, the names of the Defendants' employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal.  Mastej's complaint provides specific details about the "on-call" neurosurgeon scheme the Defendants utilized to induce six doctors to refer Medicare patients for treatment at the Defendants' hospital.   It offers specific information about the golf-trip benefit provided to four additional doctors in 2008. Mastej's complaint identifies the names of all ten doctors who allegedly referred patients after having received these financial benefits from the Defendants. Mastej's allegations regarding the financial incentives, which he claims violated the Stark and Anti-kickback statutes, meet Rule 9(b)'s required level of specificity. See Hopper, 588 F.3d at 1324 (holding that specific details about time, place, and substance of the fraud satisfy Rule 9(b)).

But healthcare providers do not violate the FCA simply by having a financial relationship with a doctor.  Merely alleging a violation of the Stark and Anti-kickback statutes does not sufficiently state a claim under the FCA.  It is the submission and payment of a false Medicare claim and false certification of compliance with the law that creates FCA liability.  And the Defendants' interim

28

claims were not false <u>unless</u> those claims submitted or presented were for Medicare patients who had been (1) <u>referred by one of the ten doctors</u> and (2) treated by the Defendants.

Stated another way, the Defendants' claims had to be for a specific type of Medicare patient, or a "patient-specific" referral, in order to be false. And the certifications in the annual hospital cost reports were not false unless the Defendants had already submitted false interim claims for this type of referred patient. Therefore, we examine what the complaint says about referred patients and whether the complaint sufficiently alleges <u>submission</u> and <u>payment</u> of interim claims for treatment of patients <u>who were referred by the ten doctors or one of them</u>.[20] See, e.g., Clausen, 290 F.3d at 1312 n.21 ("We cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of

---

[20]As noted above, Mastej's "presentment" claim in Count I requires proof that the Defendants submitted claims to the government, but it does not require proof that the government paid such claims. Mastej's "make or use" claim in Count II, as alleged in Mastej's complaint under the pre-2009 version of the FCA, requires proof that the government actually paid claims. See Hopper, 588 F.3d at 1327. We address submission and payment together because, in this case, our Rule 9(b) analysis is the same for both.

We also note that Count III has different elements of proof, including concealment or avoidance of an obligation to repay the government. At this preliminary juncture in the case, our disposition of Count III is unaffected by this difference. Unless Mastej sufficiently pleads submission and payment claims in Counts I and II, his Count III fails because it is based on false claims having been paid that Defendants failed to repay. Thus, our discussion focuses on Counts I and II.

29

specificity . . . ."). And <u>Hopper</u> reiterated that "[i]mproper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) absent allegations that a specific fraudulent claim was in fact submitted to the government." 588 F.3d at 1328.

## C.    Referred Patients

The complaint summarily states that the doctors receiving the financial incentives referred patients, and that the Defendants submitted claims and were paid by Medicare for treating the referred patients. The complaint, however, does not provide the date or amount of any claim that <u>was submitted</u> for a referred patient or <u>was paid</u> for a referred patient. Put differently, the complaint does not identify an actual representative interim claim or identify a single Medicare claim that was for a patient referred by any one of the ten doctors.

The complaint also does not provide any specifics regarding (1) the dates or frequency with which the ten doctors, or any one of them, referred patients; (2) the dates or frequency with which the Defendants treated such referred patients; or (3) the dates, frequency, or amounts of any actual interim claims for such referred patients submitted by the Defendants and paid by Medicare. There is even no allegation of the number of referred patients (whether per week, per month, or per year); the number or amounts of claims for referred patients; or the amount of

payments received for referred patients. Through four versions of the complaint, Mastej never pleaded any details as to the referred patients, or any specifics as to any interim claim submissions or payments for the referred patients. At bottom, the complaint does not specify a single claim for a single referred patient by a single one of the ten doctors and thus does not sufficiently allege any actual false claim.

We would end our analysis here but for the fact that such detailed information about a representative claim is not the only way a relator can establish "some indicia of reliability . . . to support the allegation of <u>an actual false claim</u> for payment being made to the Government." See <u>Clausen</u>, 290 F.3d at 1311; see also <u>id.</u> at 1312 & n.21; <u>Durham</u>, 847 F.2d at 1512. A relator can also provide the required indicia of reliability by showing that he personally was in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge. See <u>Walker</u>, 433 F.3d at 1360; see also <u>Hopper</u>, 588 F.3d at 1326 (indicating that a relator may satisfy Rule 9(b) by alleging "personal knowledge of the defendants' billing practices that g[i]ve[s] rise to a well-founded belief that the defendant submitted actual false or fraudulent claims").

31

Accordingly, we must also examine whether any other allegations in Mastej's complaint provide the required indicia of reliability to support his general statements that the Defendants treated patients referred by the ten doctors, submitted Medicare claims for those referred patients, and were paid for them.

## D.    Other Indicia of Reliability

Rather than submit examples or a representative false interim claim, Mastej's complaint focuses on his personal knowledge gained in his roles and duties as Vice President of Defendant HMA for six years until February 2007 and as CEO of the Collier Boulevard campus from February 2007 until October 2007. Mastej states that his personal "knowledge of Defendants' practices and actions [was] gained by his own efforts as an employee of Defendants and their affiliates, including serving as Chief Executive Officer for a hospital owned by [Defendant] Naples HMA."

As noted above, as Vice President of Defendant HMA, Mastej alleges that he "often attended case management meetings" in which Medicare patients and billing were discussed and that "every patient was reviewed, including how the services were being billed to each patient."  As a result, as Vice President of Defendant HMA, Mastej was "intimately familiar with the payor mix at the hospitals," and the Medicare billing and payments at the hospitals, which included

32

both Pine Ridge and Collier Boulevard.  Then as Collier Boulevard's CEO between February and October of 2007, Mastej negotiated contracts for on-call coverage.  Mastej alleges that as Vice President and CEO, he was familiar with the "services offered by Collier Boulevard and Pine Ridge," their patients, and the revenue generated by the services.  Further, Mastej alleges that the Pine Ridge CEO, Geoff Moebius, contacted Mastej as Collier Boulevard's CEO and asked him to split the cost of the on-call coverage in exchange for Medicare/Medicaid referrals.  Mastej claims he rejected the offer but uses that call as part of the underlying factual basis for showing his personal knowledge of the submission of false claims for referred patients at Pine Ridge.  And Mastej worked for over six years with the Defendants' corporate organization, albeit in different roles.

Whether a complaint alleges sufficient indications of reliability that actual claims were submitted is performed on a case-by-case basis.  Atkins, 470 F.3d at 1358.  Taking all of these and other above allegations in the complaint together, we conclude Mastej's complaint contains sufficient indicia of reliability for his personal knowledge that the Defendants actually submitted interim claims to Medicare for patients referred to the Medical Center as part of the on-call incentive scheme during 2007.

33

Importantly here, during 2007 Mastej was not a corporate outsider who only speculated that the Defendants must have submitted or paid claims to the government. See Clausen, 290 F.3d at 1310-12, 1314. He did not base his knowledge on rumors or mere conjecture. See Atkins, 470 F.3d at 1359; Sanchez, 596 F.3d at 1303 n.4. To the contrary, during 2007 Mastej was a Vice President of Defendant HMA (which oversaw both Pine Ridge and Collier Boulevard) and then CEO of one of those hospitals. As Vice President, he had direct information about both Pine Ridge and Collier Boulevard's billings, revenues and payor mix, and he was in the very meetings where Medicare patients and the submission of claims to Medicare were discussed. See Walker, 433 F.3d at 1360 (noting that allegations of personal knowledge resulting from employment with the defendants and discussions with the office manager about the submission of claims provided a basis for the relator's knowledge). As CEO of Collier Boulevard, he alleges that he continued to be familiar with the Defendants' Medicare patients, services and, importantly, revenues. At this preliminary stage, Mastej has sufficiently articulated how he allegedly gained his direct, first-hand knowledge of the Defendants' submission of false interim claims to the government and the government's payment of such claims. See Atkins, 470 F.3d at 1359.

34

Critical to this conclusion is also the fact that the type of fraud alleged here does not depend as much on the particularized medical or billing content of any given claim form. In other FCA cases, the allegation is that a defendant's Medicare claim contained a false statement because the claim sought reimbursement for particular medical services never rendered to the patient, see Atkins, 470 F.3d at 1354; Corsello, 428 F.3d at 1011; Sanchez, 596 F.3d at 1302; or for medical services that were unnecessary, overcharged, or miscoded, see Clausen, 290 F.3d at 1302; Corsello, 428 F.3d at 1011; Atkins, 470 F.3d at 1354; or for improper prescriptions, see Hopper, 588 F.3d at 1322; or for services not covered by Medicare, see Sanchez, 596 F.3d at 1302 & n.2. In those types of cases, representative claims with particularized medical and billing content matter more, because the falsity of the claim depends largely on the details contained within the claim form—such as the type of medical services rendered, the billing code or codes used on the claim form, and what amount was charged on the claim form for the medical services.

This case, however, turns on the Defendants' submitting interim claims to the government for referred Medicare patients after having engaged in an incentive-for-referral scheme and then falsely certifying at year-end that they have complied with the applicable healthcare laws. The name of the patient is needed to

35

ascertain if the patient was one referred by one of the ten doctors. But the type of medical service rendered and described in that interim claim, the billing code, or what was charged for that service are not the underlying fraudulent acts. In other words, the claim-falsity in this case does not turn on those usual types of medical-claim details. A plaintiff must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts. And during 2007, Mastej was actively and heavily engaged in the Defendants' business and revenue operations, as outlined above. For these reasons, considered cumulatively, we conclude that Mastej's complaint contains sufficient indicia of reliability for Mastej's allegations that during 2007 the Defendants had an incentive-for-referral scheme with six neurosurgeons, actually submitted false interim claims to Medicare for such referred patients, and were paid. These allegations accordingly satisfy Rule 9(b)'s particularity requirement as to claims during 2007.

## E.    2008 and 2009 Calendar Years

On the other hand, we find that Mastej's complaint does not satisfy Rule 9(b) with respect to his allegation that the Defendants sought and received reimbursement from Medicare for patients referred in the two alleged incentive schemes <u>after</u> Mastej ended his employment with the Defendants in October 2007.

36

As noted above, Mastej's complaint alleges the submission and payment of such interim claims only in a generalized and conclusory manner. Standing alone, these general allegations do not satisfy Rule 9(b)'s particularity requirement. See Clausen, 290 F.3d at 1311. Mastej's complaint does not offer any other indicia of reliability for his assertion that interim claims for referred patients were actually submitted and paid after he left his job. After his employment ended, Mastej was no longer privy to information about the Defendants' business practices, Medicare patients, referrals of patients, the billing of services to Medicare, or revenue from Medicare reimbursements. The indicia of reliability that existed while Mastej served as Vice President and then CEO disappeared when he left the Defendants' employment in October 2007.[21]

To be sure, we do not suggest, much less hold, that a qui tam plaintiff-relator can never base his case on false claims submitted after he left a defendant's employ. Instead, we conclude only that under the particular context of this case, Mastej has not provided the required indicia of reliability for his general allegation

---

[21]As noted in footnote 1, after dismissal of his complaint, Mastej filed an affidavit attempting to clarify and add certain matters. In that affidavit, Mastej stated that as CEO of Collier Boulevard, he reviewed electronically-generated census reports on a daily basis and those reports include the names of the patients, the names of their admitting physicians, and identification of the payor (i.e., Medicare, Medicaid, commercial insurance, or self pay). While we do not rely on this post-dismissal affidavit, it illustrates the access to information that he had as CEO but no longer had after October 2007.

37

that the Defendants submitted false claims for referred patients to the government after Mastej stopped working for the Defendants. That is so because the reliability of Mastej's general allegation derives from his highly significant employment roles and duties during 2007. Mastej alleges he was not only in a position to know but also gained access to the relevant information during his employment. Removed from this vantage point and from his access to critical billing and revenue information, Mastej has articulated no factual basis for his assertion that the particular doctors continued to refer patients or that the Defendants submitted interim claims for such patients after Mastej left—other than speculation that claims "must have been submitted, were likely submitted or should have been submitted to the Government." Clausen, 290 F.3d at 1311. That is not enough.[22]

In sum, as to Counts I and II, we conclude that Mastej's complaint satisfies Rule 9(b)'s particularity requirement only with respect to 2007 interim claims submitted to and paid by the government before Mastej ended his employment in October 2007. Because the 2007 hospital cost report necessarily encompassed those interim claims, Mastej's knowledge about the 2007 interim claims is

---

[22]The Defendants' Stark log, which is referenced in Mastej's complaint, does not help Mastej with respect to his assertion that Defendants sought and received reimbursement for Medicare patients referred through the incentive scheme after Mastej left the Defendants' employ in October 2007. The Stark log, at best, identifies doctors who made referrals after

sufficient indicia of reliability as to the 2007 hospital cost report.[23]  However, the complaint fails to satisfy Rule 9(b) for interim claims submitted to and paid by the government thereafter and for the hospital cost reports dependent on them.

## F.    Mastej's Argument Based on the 2009 Amendment

We recognize that Mastej contends that this case is subject to the new 2009 version of the FCA and that the 2009 amendment affects Mastej's "make or use" claim in Count II.  Before the amendment, a "make or use" violation occurred when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (1994).  After the 2009 amendment, a "make-or-use" violation occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2009).

————————————

having received a financial incentive.  It does not indicate whether the Defendants actually submitted claims for these referred patients, much less that Medicare paid such claims.

[23]On Count I (the "presentment" violation), Mastej can proceed as to interim claims submitted to the government before October 2007 and as to the 2007 hospital cost report to that extent.  On Count II (the "make-or-use" violation), Mastej can proceed as to interim claims that the government paid before October 2007 and as to the 2007 hospital cost report to that extent. While Count III (the "reverse-false-claim" violation) has different elements, see supra footnote 20, the Defendants challenged Count III on only the same grounds they challenged Count II. Accordingly, for purposes of the limited Rule 9(b) issue in this appeal, our Count II analysis applies equally to Count III.

39

Based on the change in the statutory language, Mastej asserts that he need not plead or prove that the government paid any claim to establish a "make-or-use" violation in Count II.  In Hopper, this Court held that "payment" was an element of a "make-or-use" violation before the 2009 Amendment, see 588 F.3d at 1327, but we left open the question  whether "payment" is still an element after the amendment, see id. at 1329 n.4.

We need not answer this question in this case either.  Mastej's complaint cited only the old version of the statute.   Indeed, his "make-or-use" claim in Count II parroted the language of the old version.  Mastej amended his complaint three times—but he never mentioned the new version of the statute in any of the four iterations of his complaint.  Instead, he repeated his allegations based on the old version of the statute.  The Defendants were thereby put on notice that the old version applies to Mastej's complaint and that "payment" would be an element of Count II.  It is too late for Mastej to switch horses now.

But even if we applied the new version to Mastej's Count II, our decision today would be the same.  At a minimum, the new version requires Mastej to show that the Defendants made "a false record or statement" that was "material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2009).  As we outlined above, Mastej has sufficiently alleged that the Defendants submitted false interim claims

40

during his 2007 tenure as Vice President and then CEO and that the 2007 hospital cost report necessarily included these claims and thus falsely certified that the medical services provided complied with the applicable laws. However, Mastej's complaint does not allege with sufficient particularity that the Defendants made any false statement (much less one that was material to a false claim) thereafter.

## X.  CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the district court's dismissal of Mastej's complaint and remand for further proceedings consistent with this opinion.[24]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

---

[24]We also conclude that Mastej has not shown that the district court abused its discretion in denying Mastej's discovery requests.

41